## ANTRIM LUMBER CO. v. ANDERSON et al.

No. 25280. June 4, 1935.

Rehearing Denied July 16, 1935.

Application for Leave to File Second Petition for Rehearing Denied Sept. 10, 1935.

Bailey E. Bell and Clifford Klein, for plaintiff in error.

Paul P. Pinkerton and E. J. Doerner, for defendant in error Sand Springs Home.

Holly L. Anderson, for defendants in error Noble M. Anderson and Aouida C. Anderson.

PER CURIAM. In 1927, Noble M. Anderson contemplated the making of many improvements upon the land upon which it is attempted to establish a mechanic's lien. He had purchased a large quantity of lumber in Arkansas, and at about that time, being in the place of business of the Antrim Lumber Company, its manager suggested that Anderson should have bought the lumber of the Antrim Lumber Company, and Mr. Anderson replied that the purchase of the Arkansas lumber "just starts what I am going to do. I am going to remodel, do some rebuilding and repairing of practically every old building I have on the farm, and you can rest assured that you can have all of that." The parties went on with that understanding.

The manner and time of ordering the ma-

terial was "whenever any of his men came down there for it to let them have it, or if he phoned down and wanted us to deliver it, to send it right out." The witness Ben Coates testified:

"Q. These chicken houses, did he build them from time to time and alter them and change them? A. Yes, sir; he would build them one at a time."

Later, the lumber company pressing Anderson for payment, Anderson said, "I will give you a note now for all that is coming, and then we will continue on with my improvements, as we did before." That arrangement was carried out satisfactorily. The transactions were then carried on from time to time through 1928, 1929 and 1930, "which was just a continuation of the old" arrangement or agreement. Anderson told the lumber company he had some new buildings he was going to build; all the houses were in bad repair and needed repairing, and he was going to remodel the chicken coop into a rabbit hutch, and repair his fences, which were in bad shape. He had a general system of remodeling and rebuilding, and that he would need lots of material in addition to what he had bought in Arkansas. The lumber company had no idea of the building he was doing or what the material was going to be used for "or what place or anything", because he never told the company and it never asked him and it did not know whether it was going "on one particular job or another." It had been furnishing him lumber ever since 1921. "He was a continuous customer." At the time the note was given and the settlement made, Anderson had on his place a big house, a barn, hay sheds, several tenant properties, wash house, basement, cellar, was continually making repairs. He was going to repair every building that needed it. A lot of them were in bad shape. He changed chicken houses into rabbitries; if the chicken houses were not warm enough, he would buy material to make them warmer; he insulated his chicken houses at one time, but he never went into detail with the lumber company nor mentioned specific improvements. Some of the lumber was used to brace a shed that was about to collapse. The lumber company never knew "when he was completely through with one house or one repair." It kept "no record of those things." When a roof started to leak he would buy more material to repair it. He had one large chicken house and several small ones around at the different tenant houses.

When the defendant in error, Sand Springs

Home, took its mortgage upon the land, its agent and attorney, who had charge of the same, "went there about the time the note and mortgage was signed, about the 14th of September, 1929, and I went up and looked around the premises looked around the house, and premises there. The house was completed and in good state of repair; he had chicken houses, rabbitry, everything seemed to be completed and in operation and no repair work of any kind was going on. I asked Mr. Anderson if there had been any repair work going on or anything that might be lienable. I asked him if there was any work out there done at all that would be lienable or subject to any lien, and he told me there had not, and I told him he had to give an absolute clear first mortgage, and he assured me it was a first mortgage and there was no claims or liens or anything that would in any way effect a first mortgage." The note and mortgage were dated September 14, 1929, the lien statement of the Antrim Lumber Company was filed August 13, 1930, and was based upon a note given by the Andersons on June 16, 1930, in the sum of $1,421.60, with interest, and evidences the value of material furnished for the making of improvements and repairs upon' the land in issue, and that the furnishing of the same began about the 16th day of April, 1928. The material furnished by the lumber company shows many items from April 16, 1928, to April 21, 1930.

The lumber company claims a lien for all of the material furnished, and that the lien statement was filed within four months from the time the last material was furnished, and thereupon relates back and includes all of the material from the date that the first of it was sold and delivered.

The trial court found against the Antrim Lumber Company. The agent of the Sand Springs Home went upon the premises and examined to see if any improvements had been made thereon whereby a lien could be established. To him there was nothing visible that bore evidence of new buildings or repairs having been recently made. The lumber company does not contend to the contrary. Under this state of the record, the question is, Has the lumber company a materialman's lien good as against the mortgagee?

In Botsford Lumber Co. v. Schriver (S. D.) 206 N. W. page 423, the facts were:

"In this conversation Schriver told Weber that he was about to make some improvements on the land involved in this action, and that he would need a considerable amount of materials therefor. Schriver testifies that he directed Weber to permit his, Schriver's, men to get the material from plaintiff's yards as they needed it for making the improvements, and to charge it to his account. This was the only arrangement for the furnishing of the materials. There was no bill or estimate submitted, and no definite statement made as to what improvements were contemplated."

"Materials bought from time to time under oral agreement, by which supplier of materials agreed to deliver them to owner's employees as called for and to charge against owner's account, held not bought under one entire contract." (Syll. No. 1.)

From page 426, Id., we quote:

"The question of what structures or improvements should be considered as parts of one continuous transaction is the real question in this case."

"Can it be considered that the erection of the improvements, completed not later than May, 1919, and the building of the garage, begun in August of that year, were parts of one continuous transaction. so that a lien statement filed in time to preserve the lien for this garage material would also be in time to preserve a lien for the materials in the structures which the trial court found to be completed not later than May? We do not think so."

In Clark v. Oklahoma Electric Co., 144 Okla. 21, 288 P. 935, the court says:

"* * * The equitable title to the building appears to have been in the newspaper company, sufficient at least to cause a lien to attach thereto. * * *

"This equipment and material consisted chiefly of electrical wiring, pipes, motors, conduits, plugs, lamp cords, brushings, boxes, lamps lamp fuses and fuse plugs, switches, electric heaters, electric fans, sockets, and the labor necessary for the installation of same, and apparently for the upkeep and replacements when some of the material was worn out or destroyed. * * *

"* * * A large part, if not all of the material furnished, was for replacements, or additional lamps and lights that were needed in the operation of the plant. The general contract included anything that the newspaper plant might need during the term covered by the contract, which was about 22 months.

"If we should assume that all the labor performed and material furnished were lienable items, we are presented with the question of whether or not this material and labor furnished under the general contract, as above indicated, were sufficient to extend the time for filing the lien so that the lien, which was in this case filed on

the 5th day of May, 1926, within four months after the last item was furnished, would be sufficient to preserve the lien for all the material and labor furnished during the entire period. * * *

"Here we have a contract construed in its most favorable light in favor of the plaintiff, that provides for the furnishing of material and the performing of labor to a newspaper plant, both for the installation of the plant and also all that is necessary to operate same. None of the cases referred to in the brief, nor have we been able to find any on independent investigation, go to the extent of holding that labor and material furnished in the operation of a business, plant, or factory, would be sufficient to extend the time of filing the lien, unless **in the contemplation of the parties there was some period when the contract would come to an end."** (Emphasis ours.)

The court further says that "a particular undertaking that had for its purpose the accomplishment of a particular object such as the construction of a building or the drilling of a well or the development of a lease" would entitle one to a lien.

"If the material had been furnished and the labor performed in this case under a similar contract which provided **only** for the construction of a building or the installation or setting up of a newspaper plant, or the development of an oil lease, or the drilling of an oil well, the same would have perhaps been sufficient to have maintained the lien, had the statement been filed within four months after the last item was furnished." Page 23, Id.

"It is clear to us that the material furnished and the labor performed during that period was only that which was necessary in the ordinary operation of the newspaper plant. Although some of the material furnished was for new improvements in the plant, a large part of it was for replacements of material or equipment which had worn out or been destroyed. The lien was not filed until May 5, 1926. Under this record, it is our opinion that, as to all of the material furnished or labor performed more than four months prior to the filing of the lien statement, no lien was preserved; and, although it be admitted that the same were lienable under our statute, the time for filing the lien had expired." Pages 23-24, Id.

"It therefore follows that all of the material furnished and labor performed prior to the 5th day of January, 1926, were furnished more than four months prior to the filing of the lien statement, and no lien was preserved." Page 24, Id.

In the case of Dickason Goodman Lumber Co. v. Foresman, 120 Okla. 168, 251 P. 70, is the following:

" 'That from the commencement of the dwelling in 1918 until about April 1, 1923, there was no contract made as to the building of said dwelling, or the completion of same, and no continuous contract or definite contract of any kind made for the building of said premises until about April 1, 1923, and after the mortgage was duly executed.' * * *

"This contention is based upon the theory that the record shows a continuity of purpose on the part of the Foresmans from the commencement of the basement, in 1918, to the completion of the bungalow. * * *

"The pivotal point in the case is whether or not the building of the bungalow, for which plaintiff furnished the material, commenced with the digging of the basement in 1918, or with the house contracted for and built on this basement, and which we assume was commenced about April 1, 1923. * * *

"There must be some definite visible work done on the foundation sufficient to make manifest to all persons who might propose either to purchase or acquire liens on the property that a building is commenced. * * *

"This makes a different case to the ordinary case of building a house. In the ordinary case, it is one continuous plan carried out to commence and complete the house. * * *

"The exception may be further extended to cases where, after the house is completed, under a definite plan, and used and occupied for the purpose of a dwelling place, other rooms are added to enlarge it; **these additions might take place from time to time adding such units through many years.** The house when first completed might be mortgaged, and, while the mortgage was in force, the new room added and a mechanic's lien placed on the entire house and premises which, under the statute, would attach, not from the commencement of the entire building and thereby supersede the mortgage, but from the commencement of the added room, and be subject to the mortgage." (Emphasis ours.)

The court has found the issues in favor of the mortgagee, and there is evidence to sustain the findings that there was nothing upon the land to indicate that the construction or repair of a building had been commenced. Within the contemplation of the lien law the lumber company was not furnishing material under a continuous contract, but under several contracts. There was no contract providing for the construction or repair of any particular building, neither does the evidence show when any particular building was completed, nor that the repair or completion of any particular building was contemplated by the parties. The mortgage and note were given September 14,

1929; the lien statement was filed August 13, 1930. In no event would the lienor have any right to have included within its lien material furnished prior to the four months next preceding the date of the filing of the lien. We are of the opinion that the judgment of the court should be affirmed. The only issue is between the mortgagor and lienor.

Judgment affirmed.

The Supreme Court acknowledges the aid of Attorneys B. M. Parmenter, Hal C. Thurman, and John F. Sharp, Jr., in the preparation of this opinion. These attorneys constituted an advisory committee selected by the State Bar, appointed by the Judicial Council, and approved by the Supreme Court. After the analysis of law and facts was prepared by Mr. Parmenter and approved by Mr. Thurman and Mr. Sharp, the cause was assigned to a Justice of this court for examination and report to the court. Thereafter, upon consideration by a majority of the court, this opinion was adopted.

McNEILL, C. J., and RILEY, PHELPS, CORN, and GIBSON, JJ., concur.